I first started litigating vaccine claims in 1977 when I was selected to serve on the Plaintiff's Swine Flu Steering Committee for MDL proceedings before the Honorable Judge Gerhard Gesell. We spent several years engaged in extensive discovery using consultants to help us learn the medicine and help us find qualified experts on causation issues. For years I tried cases all over the country in federal district courts employing consultants and experts that I felt were necessary to win those cases. Those were contingent P cases under the Federal Tort Claims Act. So I was the one who was deciding what I should pay and what I should employ in the way of consultants and experts. And I did what I had to do because I take very seriously my obligation to zealously represent my clients. For over 30 years I've been litigating vaccine injury cases and I know full well what it takes to win these cases. In 1998 I was involved in the beginnings of this program, the I looked at the program as being a petitioner-friendly, informal, non-adversarial, generous program that would be quick and easy and I assumed that getting paid would also be quick and easy. Well this is an unusual statute, is it not? It is, correct. Because you get paid under the statute whether you win or lose. Exactly, Your Honor. The difficulty I'm having, frankly, is at least part of your claim here involves something like $50,000 in fees for the trips for you and Dr. Geyer to Paris, France and Sorrento, Italy. And the special master says I can't state strongly enough how shockingly unreasonable many of the claimed expenses are. I have a hard time, particularly given our standard of review, of getting by that. Tell me how I can do that. Your Honor, I think there are two standards that have been looked at here. One is what would a client pay, a reasonable client, and the other is what does the other side pay? In the recent autism litigation, which also was a I'm sorry, a client and the other side And what does the other side? I'm facing in these cases the richest The government Largest law firm in the country, the Department of Justice, and the respondent in these cases is Health and Human Services. So that's what we're dealing with to begin with. The trip to France, if I could address that and talk about that. First of all, in the recent autism litigation, the government not only hired two law firms in England, but went to England to depose doctors in England. They deposed Dr. Ehrengut from Germany and England. So the idea that in these cases we don't travel is ridiculous. Well, I'm not sure anybody is saying we don't travel here. You didn't go to Paris, France to depose anyone, did you? No, I went to Paris, France to learn at the place where the most evidence was at the time. You have to understand that in France, they decided to vaccinate their entire adult population with hepatitis B vaccine. When they did that, they had tremendous numbers of cases of multiple sclerosis and other injuries that were reported in the medical literature. They had ongoing litigation there where they had experts involved. One of the issues that, for instance, is asked is, well, when you do research, isn't research just research? No, it's not. It's not a matter of bringing up PubMed and putting a hepatitis B vaccine in MS, and whatever comes out the other end is the answer. Because as we learned, hepatitis B vaccine contains not only the surface antigen, it contains aluminum, it contains thimerosal, which is 50% mercury, it contains yeast, it contains a variety of things, all of which have the capability of producing various injuries. The first time I ever heard the word MMF, macrophagic myofasciitis, was when a Dr. Guyer found an article by a Dr. Girardi in France who had looked at hepatitis B vaccine cases there and discovered that small aluminum deposits would actually stay under the arm up to eight years after the vaccination, and that was causing all kinds of conditions like multiple sclerosis, chronic fatigue syndrome, other neuropathies. He called it macrophagic myofasciitis. Never would have found that without Dr. Guyer. And I discovered that Dr. Girardi in France had been doing a lot of research on this very subject. As a matter of fact, his research was... Well, I guess I'm not sure that that's necessarily dispositive of whether or not it was necessary to go to France. I mean, the argument is that the special master wasn't saying there was absolutely nothing in Paris, France, that was relevant at all to this case. I think he was questioning whether or not a trip was justified, as opposed to using the internet or a telephone or videoconferencing to ascertain what it is you needed to ascertain. The telephoning, I can tell you, is almost impossible. Even videoconferencing. We've had, we've brought an expert from Israel, for instance, Dr. Schoenfeld, who has testified in front of special masters who said, please bring him in person. It's too difficult to talk to him over the phone. Even experts in this country, I will not talk to them over the phone. I go to sit down and meet with them. That's the only way you can get their attention for a block period of time and actually learn something. You cannot do that over the phone. I had a translator... And so there was, wait, in Paris, there was the meeting with an expert? Was that what the Paris trip was about? The Paris trip was meeting with Dr. Girardi, who had developed this macrophagic myofasciitis theory. When we came back from that, we even tried to set up the same type of testing with some doctors in Florida. It never, it never came to fruition. It fell through because those doctors didn't want to testify in the program. But nevertheless, we tried to develop a line of testing that we could do upon our clients to find out... Did the doctor that you interviewed in Paris come and testify? Was he a planned witness? We never brought him. I didn't think the cost of a French translator and everything else was worth it. Now that doctor did travel to Puerto Rico. And he did tell about his findings to representatives from Health and Human Services, to other experts that the government has used in these cases. And there was a large symposium held there. So I think it was critical for me to find out more about the evidence that he was presenting. In addition, we talked to Dr. Girardi in France, who was the doctor who was selected by the French courts as their independent expert on reactions to hepatitis B vaccine. We also met with and talked with the lawyers in France who were litigating the issue and who were developing evidence of causation themselves. And we talked with journalists in France who were developing evidence from patients and clients that they were collecting. So we were trying to go to the place that had the most evidence at the time. If you go back and look at the history of this program, when the program first started, over 90% of the cases were what we call table injuries. That changed dramatically. If you heard Chief Special Master Lord in this room last week in the judicial conference, she had a slide presentation where she pointed out, presented to the people who attended, the fact that things have changed dramatically in the program. One of the tables that she showed was a table that showed that once in 1996, when the Secretary of Health and Human Services changed the definitions of the injuries due to DPT vaccine, table injuries almost became non-existent. And today, over 90% of the cases are causation in fact cases, where the table is not even relevant. And all this was pointed out. In 1999, you see the peak of hepatitis B vaccine cases that was filed at that time. Because hepatitis B vaccine was added in August 1997, and the program says that anyone vaccinated in the eight years prior to that time could file in the program. So we filed over 150 cases in the program. We had a lot of people who were responsible for it. This was a lot of responsibility to develop causation. This was back at the time when we were dealing with the Stevens case, which as you know, came into existence in March of 2001. I mean, from March of 2001 until July of 2005, the Stevens case was the controlling case in causation in these cases. That was the five-prong test, which this court finally reversed in July of 2005 in the Alton case. Even after that, there were still questions raised until some of those questions were resolved subsequently in Capozzano. 59.93 of the hours that I claimed in this case dealt with prior to March 2001. 196.87 hours dealt with April 1 to June 2005. Now, I appreciate your comments about the Stevens case, but the special master certainly did take that into account. I mean, you were awarded over $100,000 in this case, and that included, and the reason for allowing that amount was because of the need for your experts to come in and testify as they did. I'm not primarily here about, if this were just about my fees, I wouldn't be here. I'm here primarily because I used a medical consultant for over 10 years who I relied upon, who helped produce hundreds and hundreds of medical articles.  Dr. Geyer. Dr. Geyer. But some of the fees involved not just Dr. Geyer, but Dr. Geyer's son, correct? Did you rely on him? Yes, and his affidavit- Period? Yes, ma'am. His affidavit is in the appendix. His affidavit points out that he is a co-author on at least 10 articles about hepatitis B vaccination. He also did a lot of the medical research. There's an affidavit there that he did not duplicate time and effort. He did things separately. It's like if I have an associate that works with me in the law firm, I try to have the associate do as much of the work as they can possibly do so that I don't have to do that work. So there's no difference between Dr. Geyer and his son and me and having an associate working with me. The fees we're charging are not outrageous. For over 10 years, they provided this service. They filed what I thought was a conservative bill of $97,000 and the special master arbitrarily gave him $10,000. $97,000 to $10,000. I'm not here complaining about my fees. I've already negotiated my hourly rates with the Department of Justice a long time ago. I know that my hours are going to get cut every time I file a fee application. The only time I've ever gotten more fees than I asked for was when Judge Gazelle, back in the Mulder District litigation years ago, gave me a $25,000 bonus for the work that I did in the Swine Flu Steering Committee. It's the only time. So what we're talking about here is a situation where the standard should not be what is the minimal amount that you can get by with to get through a case. If all I was interested in, in fees and costs, I would have tried these cases back during the Stevens era and lost them all. And they would have been lost. But because I didn't do that, I have a list here of clients, cases that I won involving hepatitis B vaccine, multiple sclerosis, Guillain-Barre syndrome, small fiber polyneuropathy, Azures, Addison's disease, autoimmune hepatitis, CIDP, POTS, rheumatoid arthritis, juvenile rheumatoid arthritis, arthralgias, osteonecrosis, nephrotic syndrome, allergies and sensitivities. I won cases because of the vast work that was done. If we can't be paid for the medical consultants that we use to develop these cases, this was over 150 cases I was responsible for. The amount of the billing in this particular case for all the general work done on those cases amounts to $650 per case. That's de minimis. To take my consultant and reduce his well-documented bill, nobody's claiming he didn't do the work. Nobody's suggesting that the work wasn't done or that his bills are fraudulent or inaccurate or anything like that. But to just arbitrarily reduce it from $97,000 to $10,000? I can't live that way. The Avera case pointed out that we cannot But to delay a fee award would work substantial hardship on plaintiffs and then counsel and discourage the institution of actions, despite the clear congressional intent to the contrary. The same thing applies to adequate fees and costs. If we are denied fees and costs for our consultants and the experts that I feel I need to win cases, then that effectively is going to mean that I can no longer represent those people and the only people I can represent in the future are going to be the petitioners that pay their own costs. So the people who need my help the most, the people who can't afford to pay for experts and consultants, those people are not going to have my services because I can't afford it. I can't afford to have a $97,000 bill submitted for work over a 10-year period on 150 cases and then get $10,000 for it. I can't afford that. Okay, let's save your rebuttal time, Mr. Shoemaker. Ms. Martin. Thank you, Your Honor. May it please the Court, my name is Anne Martin and I'm here representing Respondent. A very important issue in this, a very important matter in this case is the standard of review. The reasonable attorneys' fees and cost determination by the special master is a very factual determination and this Court must give that determination substantial deference. The issues here are the problem that Mr. Shoemaker unreasonably used a consultant as a medical expert. He unreasonably used Dr. Geier and his son, Mr. Mark Geier, and the bill was for $97,000. The special master reduced that to an award for 50 hours of work to do background investigation, to do the background work of looking into what cases here, what claims here might be able to go forward, to do some background medical investigation in the case. The difficulty here, though, is a practical matter. These cases, I think this group of 150 cases, this was going on for a decade, right? That's true. I think the point that Mr. Shoemaker is making, which may have some swat, is that you don't know at the early stages certainly what's going to be probative and what's not going to be probative. I mean, he hired an expert. This guy was credentialed. He's been used in other cases. Now we're going back and we're looking at the ultimate result of 150 relatively complex cases and telling him that he shouldn't have potentially used this expert to do certain investigation. And doesn't that seem quite arbitrary or at least overly stringent to you? Your Honor, in this particular case, the determination by the special master was not arbitrary. Dr. Geier has been working in the program for a long time. He was well known to the court and he had been working with Mr. Shoemaker for a long time. There's a long history of decisions in this court by the special masters, by the CFC judges, and outside this court that have found that Dr. Geier goes beyond his areas of expertise and that he offers opinions that are not reliable. So there was notice from the onset that Dr. Geier's participation so extensively- Wait a minute. They paid him for 50 hours worth of work. So somebody must have assumed that he was at least reliable during those 50 hours, right? Your Honor, it's correct that he was given 50 hours of work. The special master was very clear in his decision to say that what Dr. Geier is qualified to do is to provide background research. He has a medical degree. He can look at cases. And what was going on in the time that these fees were incurred is that there was a large amount of Hepatitis B cases that were filed at the deadline in 1999. The court, petitioners, bar, and respondents were involved in efforts to move these cases fairly and efficiently through the program. There were other experts other than Dr. Geier implicated in this case, correct? Your Honor, in the particular Hepatitis B proceeding, what we're talking about here are general fees. This is background work. 150 cases across the board. Now in each of those cases, Mr. Shoemaker and all the other counsel, I mean the other, he had 150 cases. There were a lot more cases. They employed experts for each individual case to look at each individual case as well. In this case, Dr. Geier was paid 97, billed for $97,000 and his hours, substantial number of hours. Though those were reduced, Mr. Shoemaker was also consulting with, he was paid to consult with 10 other experts. His billing records are replete. There's a list of 10 other experts that he consulted from 1997. And those fees were awarded. His fees, there is no bill for those experts, but Mr. Shoemaker's time to consult with those experts, those fees were awarded. And there was about 40 hours of time. So the idea that he was not given the tools or the time to develop the cases, it's hard, I mean, it's kind of hard to get a hold of them. In addition to this work in the background cases, $10,000 for Dr. Geier, there was Dr. Belanti, who was an immunologist, who was a credible expert, who in this case billed 18.5 hours, again, just for the background research, $5,500. Mr. Shoemaker was paid for that. The work of Dr. Geier and Mr. Geier, Mr. Shoemaker is saying that the bill is not challenged. We're not saying that he didn't do the work. When you look at the bill, there's a question of what exactly he was doing. A big problem that the special master had with the Geier's bill was that Dr. Geier and his son, Mr. David Geier, was going to all of the meetings with these 10 different experts with Petitioner's Council. And I think Petitioner's Council is kind of selling himself short a little bit. He's been in the program for a long time. He knows complex medical issues. He can talk to experts. And the special master made these findings. There is no reasonableness that these two individuals needed to travel with him to all of the meetings. I was a little confused about the distinction between the role of consultant and the role of expert. Now, I take it that, well, you tell me. Dr. Geier was acting as a consultant but not an expert, correct? That's true. That's what the special master said was appropriate. Whether or not in the instance, in the intervening, in the initiation, Mr. Shoemaker intended to use Dr. Geier as an expert, I'm not sure. But has he ever been an expert in any of these cases as such? As opposed to a consultant? In terms of the Hepatitis B cases, the 150. He was not in the Riggins case. I don't know that he testified in other Hepatitis B cases as they developed. He has been an expert numerous times in the program. Right. Well, but you don't know if he's testified as an expert in any of the Hepatitis B cases. I can't say for certain that he has not. What is his specialty? He has a background in genetics, is his primary specialty. And what the special master was doing was allowing him to help Mr. Shoemaker sort through the medical issues, which is a reasonable use of a doctor. But what happened here was he overused him. He used him too much. And it wasn't that Mr. Shoemaker didn't have noticed that this would be a problem. The special master's decision in this case really goes to the idea that petitioners' counsel have a duty to monitor fees. They have a duty to monitor the expert's costs. Mr. Shoemaker should have known. I mean, there's cases upon cases about a body of attorney's fees laws that duplication of effort and unnecessary work is not going to be compensable. So it really shouldn't, I don't think, come as a surprise to Mr. Shoemaker that a $97,000 bill for the Guyers in this case was found to be unreasonable. How much of that was attributable to the two trips? It was about $40,000 was attributable to the two trips. And this is for Dr. Guyer's expenses? That's correct, Your Honor. And the time billed by Dr. Guyer, by Mr. Guyer, and the expenses to get to the trip. I mean, in this case... So it's $40,000 out of the $90,000 that was denied. And that's an approximation. But yes, there's about that amount that's attributable to the travel. The other travel that was billed here, the trip to Sorrento, Italy, was for Dr. Guyer and Mr. Guyer to attend a medical conference. Now, when you said $40,000, that's both trips. That's Paris and Sorrento. Yes, Your Honor. And I think it's about $44,000. I think the Special Master's figures estimated Paris at about $20,000 and Sorrento, Italy, at about $24,000. I mean, the billing here, they billed at full rate for travel. They both did. So we're talking about 20 hours, I think, to get to and from Paris. And they're billing at... I think it was close to 34 hours to get to and from Sorrento, Italy. They charged for the medical conference. They charged for 20 hours at the medical conference. So the problem, as I understand the government's position, is that if, for instance, as a result of attending and participating in these conferences and the consultations with the people who know the most about hepatitis B, let's say, in the world, had they come up with a clearer basis for causation than we have now, then the government's position might be different. That is, it's the problem that there are still unknowns in this particular physiology, or whatever the word is, in terms of establishing the relationship.  So certain presumptions are apparently scientifically supported adequately, at least to put hepatitis B on the table. But for the off-table issues, we still have all of these unknowns. And apparently, this effort that was put in by... We see Dr. Geyer's name fairly often as an expert. It seems fairly clear that he has a lot of experience in the field of immunology and vaccine injury. So the problem is that we still don't know the answers. Is that right? Your Honor, respectfully, that is not the problem at all. The question in this case is whether or not there was a reasonable use of medical consultants. Well, because had that use found some answers which we don't have, the government's position would be different. No, no, Your Honor. There is no doubt that a petitioner's counsel must be given the opportunity and given the funds to do fair and full representation of their clients. We are here because petitioners deserve their day in court, and that is why the statute was enacted. The problem is that the Act requires reasonable attorney's fees and costs. In this case, the use of Dr. Geyer was simply too much. It's very clear. I mean, when we look at the Supreme Court cases in Hensley, the question as to what is reasonable attorney's fees and costs is not new. It's not new to the program. It's not something that only the petitioner's bar is struggling with. Or it's not even so much of a struggle, you know, when we go across it. The idea of not ever checking on these fees and costs, of simply allowing them to go to every meeting with you, and then to bill the vaccine fund for that, I mean, to travel to Paris. So it's not a matter of they didn't get the right information. They weren't effective. It was not an effective use of medical consultants. Mr. Shoemaker was given ample resources. He was given 40 hours of time to speak to doctors. I mean, they included toxicologists, immunologists, cardiologists, neurologists. And this is in the course of simply building up the background. I mean, just simply getting the cases off the ground. Then, once these cases were kind of off the ground, each of them kept going along a track, and then there was another expert brought in. So in that case, the immunologist would be paid specifically for looking at medical records. In addition, medical consultants were also used in the individual cases. If you look just here at Mr. Riggins' case, not with the hepatitis B proceedings in general, with hepatitis B background work, but simply looking at his case and his medical facts, a medical consultant, Dr. Mark Greenspan, was paid $2,200 to look at it. So certainly, petitioners need their attorneys to have access to information, to research. They certainly need to be able to spend time talking to experts. But there is a line. I mean, what the special master said was, this isn't a blank check here. And so what the special master did was look to see whether or not this was reasonable. And he was simply not convinced. So it's not really about the fact that we don't have answers to the questions. I mean, hepatitis B has been put on the table, which means that petitioners get their day in court. And there's no presumptive injuries with hepatitis B. But we can't, but the problem is the billing was simply just too extensive. And the special master was right to say that it went too far. Did I answer your question, Your Honor? Because this is not about, it's very important that petitioners' counsels are given effective, the means for effective representation. It is difficult. And here, particularly with counsel who has a very, very large number of clients. And if one were to spread the cost of the trip to consult with a French physician who I gather is a significant figure in hepatitis B, if that were spread over 150 clients rather than put all together in one bill, all of a sudden it doesn't look like such a large expenditure. Your Honor, the point is an important one. But had it been spread out, it still would not have been reasonable. And that is because we have to go back to what was done. We look at what was done. And it was not, the special master found that it was not reasonable. In considering all the evidence, Mr. Shoemaker simply did not make the case that the cost, when we look at the factors, when we look at the travel, the cost of travel, the amount of time, the fact that two people went. It simply, there isn't a balance. There isn't a balance there. The special master needs, is appropriately exercising his discretion when he looks to balance these factors. The question, you could have picked up the phone call. And let's look again at exactly what was going on, what they were looking at here, what they were doing. And we're talking about background research. In each one of those 150 cases, there was this background research. But again, the cases moved forward. And there was more billing and more billing and more billing. And Dr. Geyer continued to serve as a consultant in some of the fact-specific cases. So there was ample, he had ample resources to develop the cases and to be an effective representative. Okay. Any more questions for Mr. Shoemaker? Thank you, Ms. Martin. Mr. Shoemaker. Thank you, Your Honor. I would like to address a couple of things. One is, let's talk a little bit about what I'm facing on the other side in the way of resources and what I have to compare my resources with. The government, the Health and Human Services can pick up the phone and can pay the money and can hire the Institute of Medicine to conduct a study on anything they want. As a matter of fact, after we've already won cases in the program, we already won hepatitis B-causing multiple sclerosis, Guillain-Barre syndrome, transverse myelitis, rheumatoid arthritis. The list goes on. That's the work of Dr. Geyer, the consultant that helped me get the experts, has borne fruit. We have won cases. But now that we've won cases, HHS can pick up the phone and have the Institute of Medicine say, let's go back and research whether hepatitis B vaccine causes these things. Things that have already been determined by the court that they were caused by the vaccine. Look at footnote 15 on page 21 of our brief. I'm not sure I understand why that's a problem. Wouldn't you want to have... If these studies were coming back and helping me, that's true. But the Institute of Medicine reports are never coming back and helping. Well, presumably, you don't think the Institute of Medicine has got the fix in to try to come out? I wouldn't have said that until 2004. In 2001, the Institute of Medicine said that it was biologically plausible that thimerosal caused autism. In 2004, three years later, even though there was more evidence on the table, they took that back and said, no, we don't think that now anymore. So you think the Institute of Medicine is cooking the books? And sending back the reports in a way that will help defeat the claims of the... I absolutely do think that. Because in 2004, they not only said that, but they said, we don't think any further research is necessary. Now, in 2005, there was another Institute of Medicine report that criticized the government for not giving access to the vaccine safety data link data, data which Dr. Geyer has been trying to get access to for years. But if you look at footnote 15 on page 21, it's just a list of some of the articles written by experts that the government has used in cases against petitioners. And these are all articles that have been supported by funds from the vaccine compensation program. So the vaccine compensation program, the government can pay their experts to write articles. Then they pay them again in a case to come in and testify using those articles against petitioners. I don't have those kinds of resources. I can't do that. As a matter of fact, it's well recognized how difficult it is for petitioners to find experts who are willing to testify in this program against the government. If you're getting NIH grants, and somebody calls you up and says like me and says, I'd like you to testify against the government a vaccine case, you have to go to a lot of experts to get ones that are willing to testify. Dr. Geyer going and counsel said that I'm being self-defeating. I'm not. I know a lot of medicine, but I also know that if I go to sit down with a potential expert with Dr. Geyer, who is a doctor, I'm going to get a lot farther, and I'm going to understand the language. I can't compete with doctors. I don't have a medical degree. Can I cross-examine them on specific points if I've been trained, if I've been taught the medicine by somebody like Dr. Geyer? What does a consultant do? He teaches the lawyer the medicine. He helps him find the literature to support it. We also have to look at the literature on the other side of the case to be able to defeat it. He helps us find experts. The list of things that a consultant does are extensive, and if we don't have the use of consultants, we can't afford to pay experts that much money. Not many people are willing to wait 10 years to be paid $97,000. I have three cases right now where the briefing on fees is over a year old, and I haven't gotten a decision on it. So delay in fees is nothing new to me, but I can't go out and hire experts. I've got to pay them. Dr. Geyer, you asked an important question about his qualifications. Counsel said he's in genetics. Genetics is a very important part of cases today because genetic predisposition is why some children react to vaccines where others don't. Dr. Geyer is also an epidemiologist. He's a fellow in the American College of Epidemiology, and he's also a highly trained and accomplished vaccinologist. He's been that for over 30 years. He worked with the National Institutes of Health. He has papers that were so important, published in Nature back during that time, President Nixon received him into his office to congratulate his team on what they'd done. He spent a lifetime in the vaccine field. He was probably the primary moving force for this country switching from wholesale DPT vaccine to a cellular vaccine. He has not made a lot of friends in the government by doing that. This is an attack, not only on Dr. Geyer, but it's an attack on petitioners' ability to hire competent counsel and competent consultants to help them find experts and win these cases. Judge Newman was absolutely correct. When you take the cost of this and spread it over all these cases, it was de minimis. I looked at my... I had a chuckle because I looked at my billing. I didn't even bill for my airfare in France. I billed for a room that was a dump, that was $80 a night in Paris while I was there. I had a doctor in France who lined up all the meetings, who went to all the meetings with us, didn't charge us a dime, translated where necessary. This was the most efficient trip to France to meet with multiple doctors, multiple lawyers, and multiple journalists in a country that had more information about hepatitis B vaccine reactions than any place in the world. They had ongoing litigation that was so far ahead of ours, it wasn't even funny. That trip was valuable. It was essential. Dr. Geier going to Italy was very essential because he was invited to go to an international conference of immunologists to present his data and his information. He spent that time meeting with dozens of experts. You could not possibly have gotten that many experts in one room at one time to be able to meet with and try to find potential experts. That's the kind of efficiency of a trip. I've been in cases where I've spent two days in California meeting with a pediatric neurologist. That cost me more to go there. I spent more time there. I billed 34 hours for the trip to France. That includes the preparation time and the meetings. That was a week. I spent 34 hours over a little over a week preparing for that trip and going there and the meetings. I didn't charge for anything except the meetings. Our bills are extremely reasonable and we cannot have a situation where we submit over a 10-year period an extensive detailed invoice. And please, if you look at the appendix, you'll see not only is their invoice detailed, but they filed affidavits explaining the work they did. They filed affidavits confirming that they didn't do any duplicative work as counsel implicated. What they're saying is the bill is simply too much and it was not effective. It was effective. It was not too much. And this is totally arbitrary and capricious to say otherwise. Okay. Thank you, Mr. Shoemaker. And thank you, Ms. Martin. The case is taken under submission. The court will stand in recess for 15 minutes.